# McCormick's Appeal.—Billmyer's Estate.

1. A sale of partnership real estate, under an order of the Orphans' Court for the payment of a deceased partner's debts, passes only his interest in it, notwithstanding the legal title was in him alone.

2. Billmyer, owning a mill, &c., formed a partnership with Follmer; they agreed by parol that the mill should be part of the partnership fund; part of the consideration was paid by Follmer in cash, the rest to be paid out of the profits of the business. Follmer went into possession with Billmyer, and improvements were made out of firm funds. *Held*, that the title of Billmyer did not pass to the firm.

3. A tenant in common in possession cannot by parol pass his title to his fellow in possession, because there cannot be the distinct transfer of possession which is regarded as equivalent to a written contract.

4. Proof by writing and even record is more rigidly required in conveyances to partnerships than in other cases.

5. A partnership may have a resulting trust when the firm funds have paid for the land, or a constructive trust in land acquired after the partnership has been formed.

6. A parol agreement made before a firm exists to put land into the firm, or to consider it as firm property, passes no title either in law or equity.

7. A judgment-debtor owned two different lots; he sold one without discharging it from the lien; the lien was revived generally. *Held*, that the vendee of the lot sold was not concluded from asking that satisfaction of the judgment be exacted from other lands of the vendor.

8. The equity to control the order in which properties shall be taken to satisfy a judgment is not against the judgment, but against the execution.

March 24th and 25th 1868. Before STRONG, READ, AGNEW and SHARSWOOD, JJ. THOMPSON, C. J., at Nisi Prius.

Appeal from the Orphans' Court of *Northumberland county*, in the matter of the estate of Martin Billmyer, deceased: To October Term 1867.

Martin Billmyer died in April 1862: administration on his estate was granted to John Porter, Esq. On the 17th of June 1865 he filed his account, which was confirmed nisi, August 8th following. The administrator charged himself with personal estate

and proceeds of sale of some real estate; "also with proceeds of saw-mill property, $9200;" and claimed credit amongst other things, for "Cash paid P. Billmyer, $4000;" "Cash paid D. Esbach, $3000."

Exceptions were filed to the account; two of them were to the payments to P. Billmyer and D. Esbach, above stated. The exceptions and account were referred to William M. Rockafeller, Esq., for adjustment and distribution—the estate appearing to be insolvent.

The auditor found that on the 1st day of April 1853, Martin Billmyer, the decedent, and Philip Billmyer were the owners of two adjoining pieces of land, containing respectively 13 acres and 2 acres, known as the saw-mill property. On that day Philip conveyed his moiety to Martin, and took a mortgage on the moiety for $4000, purchase-money.

Martin then went into the lumber business on the saw-mill property, and in the winter of 1854, prior to the 20th of February, being in possession of the mill-property, he contracted by parol to sell the undivided half of the real estate and of the interest in the business to Jacob M. and William Follmer, for $6700; the whole to be partnership property, and the business to be carried on by them as partners. The Follmers were to pay $2000 cash, and the balance from the profits of the business. They paid the $2000 on the 20th of February, and entered into possession with Billmyer in the spring of that year. The firm subsequently built another mill on the property at a cost of $6000, and made other improvements, paying for them out of the partnership funds. They also purchased an adjoining tract of 9 acres, which they paid for from the partnership funds, but the deed dated April 1st 1854, was taken in the name of Billmyer alone. No deeds for any of the real estate were ever made by Billmyer to the other partners. The facts reported by the auditor on this point were derived mainly from the testimony of Moses Chamberlain, a partnership-creditor.

On the 22d day of March 1854, John Porter, Esq., sold and conveyed to Martin Billmyer a house and lot of ground in the borough of Milton. Part of the purchase-money was secured by three judgments, entered on the 29th of the same month to January Term 1854, viz.: No. 112, for $500; No. 113 and 114, for $750, each. Billmyer sold the Milton property to John McCormick, who paid for it in the spring of 1857. Judgment No. 112 was revived for the use of John F. Dentler, February 7th 1862, for $111.34. The other judgments were revived to August Term 1858, and again to August Term 1863, for the use of John McCormick. The lien of these judgments continued on the Milton property, and they were unpaid at the death of Billmyer. Prior to August 6th 1861, William H. Follmer sold his interest

in the partnership to J. P. Hackenburg, and the business was continued in the name of Billmyer, Follmer & Co. On the day last mentioned, Daniel Esbach recovered a judgment for $3000 against Billmyer, Follmer and Hackenburgh for a partnership debt.

The administrator in pursuance of two orders of the Orphans' Court, sold the 13 acre lot, the 2 acre lot and the 9 acre lot as one tract, for $9200.

The auditor found that the real estate was partnership property, and after awarding to Philip Billmyer the amount due him on his mortgage for the purchase-money of his interest in the mill-property sold to Martin, he reported that the balance should be distributed to the partnership-creditors.

He allowed the credit of $3000, taken in the administration account, as paid to Daniel Esbach on account of his judgment against the partnership, and further awarded to him $190.84, the balance still due on the judgment. After deducting these amounts and the expenses of the audit, he found a balance of $1271.62 in the hands of the administrator, which he distributed amongst the partnership-creditors.

He excluded the claim of McCormick—1st. Because having two funds to which he might resort, viz., the Milton property and the mill property, and the other creditors having but the mill property, he was of opinion the Milton property should be exhausted before he went upon the mill property. 2d. Because the mill property had been sold to the firm before the Milton property was sold to McCormick, and as being last sold it was first liable to discharge the common lien. 3d and 4th. Because the judgments were not entered until after the saw-mill property had become firm assets. 5th. McCormick should have shown under the several writs of scire facias on these judgments, that the plaintiff in these judgments could not enforce payment from the Milton property until the other real estate of Billmyer bound by them had been disposed of; and having neglected to do so, that he was concluded by the judgments.

Exceptions were filed by McCormick to the auditor's report, viz.: allowing the credits in the administration account to Philip Billmyer and Daniel Esbach; reporting that the proceeds of the sale of the mill property were partnership assets; distributing them amongst the partnership-creditors; and excluding McCormick's judgments from distribution; and receiving and acting on the testimony of Chamberlain, who was interested in the distribution.

The court (Jordan, P. J.) reduced the amount awarded by the auditor to Philip Billmyer; and with that correction confirmed the report.

McCormick appealed. The errors assigned were substantially the same as the exceptions taken to the auditor's report.

[McCormick's Appeal.]

*W. C. Lawson* and *J. W. Dornley*, for appellant, referred to Doner *v.* Stauffer, 1 Pa. R. 198; Gilmore *v.* N. Am. Land Co., 1 P. C. C. 460; Kramer *v.* Arthurs, 7 Barr 172; Brawdy *v.* Brawdy, Id. 157; Erwin's Appeal, 3 Wright 535; Galbreath *v.* Galbreath, 5 Watts 146; Frye *v.* Shepler, 7 Barr 91; Haslet *v.* Haslet, 6 Watts 464; Workman *v.* Guthrie, 5 Casey 495; Chadwick *v.* Felt, 11 Id. 305; Ferguson *v.* Staver, 9 Id. 411; Hale *v.* Henrie, 2 Watts 143; Lancaster Bank *v.* Myley, 1 Harris 544; Ridgway's Appeal, 3 Id. 177; Lacy *v.* Hall, 1 Wright 360; Nailer *v.* Stanley, 10 S. & R. 450; Mevey's Appeal, 4 Barr 80; In re McGill, 6 Id. 504; Lloyd *v.* Galbraith, 8 Casey 103; Ebenhardt's Appeal, 8 W. & S. 327.

*F. Bound* and *J. B. Packer*, for appellees, referred to Lloyd *v.* Galbraith; Mevey's Appeal; Nailer *v.* Stanley; Ebenhardt's Appeal, *supra;* Colborn *v.* Trimpey, 12 Casey 463; Kiehner *v.* Dengler, 1 Watts 424.

The opinion of the court was delivered, March 30th 1868, by

Strong, J.—The principal part of the fund for distribution arose from the sale, made by direction of the Orphans' Court, of the real estate of Martin Billmyer, deceased. Under that sale nothing but the interests of which Billmyer died seised could possibly pass. The Orphans' Court had no power to order the administrator to sell anything which was not assets for the payment of the decedent's debts. The Act of February 24th 1834, confers no jurisdiction over any other lands, or estates in land, than such as belong to a decedent at his death. Hence, under an order to sell the 13 acres and 4 perches in Turbut township, for the payment of the debts of Billmyer, nothing could pass to the purchaser but Billmyer's interest. Whatever estates in the property others may have had, either as tenants in common, or partners, or holders of equitable estates, remained unaffected by the sale, unless they were estates or interests of which the purchasers had no notice; and, consequently, the purchase-money was wholly the proceeds of the land of the decedent, chargeable in the hands of the administrator with the liens which had attached in the decedent's lifetime. It was a radical mistake, therefore, of the auditor and of the Orphans' Court to distribute that fund, as if not only the estate of Billmyer, but that of the other members of the firm of Billmyer, Follmer & Co. had been sold. If it be assumed, as found by the auditor (though only as a legal conclusion), that the land in equity belonged to the partnership, and that only the legal title was in Billmyer, then only that legal title was sold, disencumbered of secret equities, and the price paid must go first to discharge the liens upon it.

But we are of opinion that the facts found by the auditor do

not justify his conclusion, that the land was partnership property. The facts themselves are wholly deduced from the testimony of Moses Chamberlain, who was an interested witness, and whose testimony should not have been consided. Treating it, however, as competent evidence, it is insufficient to establish any such ownership of the firm. Confessedly, the entire interest in the 13 acres and 4 perches belonged to Martin Billmyer on the 1st of January 1854. The auditor finds that in the winter of that year Billmyer, who was then in possession, agreed to sell one undivided half to Jacob M. and W. H. Follmer, for the sum of $6700; and the three agreed to become partners in the lumber business and in the property. It was agreed that of the purchase-money $2000 should be paid in cash, and the balance out of the profits of the business. The agreement was not in writing. On the 20th of February following, the Follmers paid $2000, to be credited as part-payment on the property. The balance does not appear ever to have been paid. In the spring of that year, precisely at what date is not shown, they went into possession with Billmyer, and the three continued the lumbering business in the firm name of Billmyer, Follmer & Co. Afterwards the firm built a saw-mill on the tract with partnership funds; and made other improvements. These are the facts substantially as found; quite as strongly stated, as they were proved by Chamberlain, the witness. Do they show a divestiture of the title of Martin Billmyer, and an effective transfer of it to the firm of Billmyer, Follmer & Co.? And do they show such a transfer before the lien of the judgments of Porter for the use of McCormick, the appellant attachéd? These judgments were recovered on the 29th day of March 1854. Most clearly, they do not. The contract to sell the land, or to put it into the partnership stock, is as much within the operation of the Statute of Frauds as any other parol contract of sale would have been. If the title passed out of Billmyer, when was it? Not when the parol agreement was made, in the winter of 1854; nor when the $2000 were paid on account, Feb. 20th 1854. This is not claimed. It must have been then in the spring, when the Follmers went into possession jointly with Billmyer. But that such a taking possession does not withdraw a parol contract from the operation of the Statute of Frauds, is too clearly settled to admit of denial. The possession taken under such a contract must not only be notorious and distinct, but it must be exclusive of the vendor. Receiving a parol vendee into joint possession with his vendor is not equivalent to the ancient feudal investiture, for which the Statute of Frauds intended to declare a writing should be the only substitute. The notoriety and significance of an entry into common possession, is much less than when an owner leaves and another person takes the sole and exclusive enjoyment. Hence, it has been held that a tenant in common in possession,

cannot pass his title to his co-tenant in possession by parol, because there cannot be in such a case that distinct transfer of possession which equity regards equivalent to a written contract: Hill v. Meyers, 7 Wright 170; Workman v. Guthrie, 5 Casey 495. In Frye v. Shepler, 7 Barr 91, it was said that "to constitute a valid parol sale under the Statute of Frauds, the possession must be exclusive of the donor." The same doctrine was asserted in Haslet v. Haslet, 6 Watts 464; so, also, in Chadwick v. Felt, 11 Casey 305. There is in the present case an additional reason for holding that the entry of the Follmers into joint possession with Billmyer did not take their purchase out of the Statute of Frauds. It is found in the fact that they became partners with him to prosecute the lumbering business. This business was to be conducted on the property. There was, therefore, a reason for their entry apart from any purchase. To the neighborhood the partnership was quite sufficient to account for the possession. The court below thought these doctrines were inapplicable to the case, because there was no tenancy in common here. But the mischief against which the statute was designed as a guard, is greater in cases of parol transfers to partnerships than in any other cases. In Hale v. Henrie, 2 Watts 143, Judge Sergeant expressed the opinion, "that when partners intend to bring real estate into the partnership stock, their intention must be manifested by deed or writing placed on record, that purchasers and creditors may not be deceived." He added, "that to permit a person, apparently owning property as an individual, to aver a different right in himself as a partner, by which his relation to creditors and others would be affected, would defeat the Statute of Frauds and Perjuries, by which no interests in real estate can vest, or be transferred without deed or writing." And in Ridgway, Budd & Co.'s Appeal, 3 Harris 177, it was said, that "when partners intend to bring real estate into partnership, their intention must be manifested by deed or writing placed on record; and it is not competent to show by parol evidence that real estate, conveyed to two persons as tenants in common, was purchased and paid for by them as partners, and was partnership property." See, also, Lancaster Bank v. Myley, 1 Harris 544. From these cases it appears that proof by writing, and even record, is more rigidly required in conveyances to partnerships, than in other sales.

Undoubtedly a partnership may hold real estate and they may have a resulting trust, where the partnership funds have paid for land. Such was the case of Erwin's Appeal, 3 Wright 535. So, there may be a constructive trust in favor of a firm, as was held in Lacy v. Hall, 1 Wright 360, but these come within the exceptions to the Statute of Frauds. In both these cases the lands were acquired after the partnerships had been formed, and while the joint business was in progress. But here there is no resulting

or constructive trust. The agreement, if there was any, to put the land into the joint stock was made before the firm had any being, and the partnership funds did not pay for it. A parol agreement to put land·into a firm, or to consider it as firm property, made before the firm exists, is wholly ineffectual to pass any title either in law or in equity.

Holding these opinions, we think the court and the auditor erred in holding the tract of 13 acres and 4 perches to be partnership property. The title, neither the legal nor equitable ownership, ever passed from Martin Billmyer, and, of course, the judgments of Porter for the use of McCormick, the appellant, were liens upon it, superior to all others except the mortgage to Philip Billmyer, and they were entitled to payment out of the fund in the hands of the administrator.

· This really disposes of the whole case. But the auditor assigned several reasons for excluding the judgments from participation in the distribution of the proceeds of the land (the saw-mill property), and these we will briefly notice. Martin .Billmyer, the debtor, had, beside the saw-mill tract, a house and lot in Milton, upon which these judgments were a lien, as well as upon the 13 acre tract. In 1857 he sold the house and lot to McCormick, who paid the entire consideration. But the person who held the Porter ·judgments continued to revive them and preserve their lien upon both properties until Billmyer's death. These facts led the auditor to conclude that the holder of the judgments was bound to look first to the house and lot for payment, the other creditors having no lien upon that property, upon the principle ·that where a creditor has a lien upon two funds of the same debtor he may be compelled by a creditor who has a lien but upon one of them ·to levy his debt out of the fund to which the other creditor cannot resort. The principle is sound, but it is inapplicable to the facts of this case. Here are no two funds or properties belonging to the same debtor. Billmyer has no interest in the Milton house and lot. The owner of that property has not only a legal right, but he has an equity of earlier date than any equity of creditors .of the firm of Billmyer, Follmer & Co. When he bought he had a right to insist that the judgments of Porter, for use, &c., should be levied first out of the remaining property of his vendor, that is, out of the 13 acre tract, and that right has not been lost. If there was, as we have seen, no divestiture of Billmyer's estate, in that, prior to the sale of the house and lot in Milton, it is the fund which is primarily liable for the payment of the judgments: Nailer *v.* Stanley, 10 S. & R. 450; Mevey's Appeal, 4 Barr 80; Lloyd *v.* Galbraith, 8 Casey 103. The appellees rely upon this rule, assuming that the saw-mill tract was first sold, an assumption which the law and the evidence do not sustain.

In the report of the auditor, and on the argument in this court,

[McCormick's Appeal.]

some importance was attached to the fact that the judgments were revived by writs of scire facias in 1858, and again in 1863, that the writs were served upon McCormick, who was then the owner of the Milton house, and that he suffered judgments to go by default. This, it is argued, concludes him from asserting now any defence he could then have set up. Undoubtedly it does. But against the writs of scire facias he had no defence. He could not deny that the creditor was entitled to a continued lien upon all the lands that belonged to Billmyer when the original judgments were entered. The only questions he could raise were whether the judgments had been paid or satisfied, or whether their lien upon the house owned by him had expired. Whether satisfaction of the judgments could be exacted from his property before the lands remaining in Billmyer were exhausted, was a question impertinent to any issues that could have been raised in the action of scire facias. If it could not, still the creditor was entitled to his judgments of revival. The equity to control the order in which two or more properties shall be taken to satisfy a judgment is an equity not against the judgment, but against the execution.

Though, then, the judgments of Porter, now for the use of McCormick, were liens both upon the house and lot in Milton and upon the saw-mill, or 13 acre tract, they are entitled to be paid first out of the latter. The case calls for nothing more. The fundamental errors of the decree in the court below were first, holding that the 13 acre tract had become partnership property in such a sense as to transfer the title from Martin Billmyer, and thus render judgments entered against him no liens upon it; and, secondly, in regarding the Orphans' Court sale as having passed something other than the estate of Billmyer, that of which he died seised, in other words, his interest as realty.

It thus appears that out of the fund arising from the sale of the 13 acre lot, the judgments 112, 113 and 114, Jan. Term 1854, having been kept alive by revivals, are entitled to priority of payment over all other claimants than Philip Billmyer, the mortgagee of an undivided half. And they are the first lien, and first entitled to payment out of the half of the tract which was not covered by Philip Billmyer's mortgage. Taking the facts as stated in the auditor's report, that part of the sum realized by the Orphans' Court sale of the 13 acres and 4 perches, applicable to the payment of these judgments, was sufficient to pay them in full. The decree is, therefore, to be reversed.

> The decree of the Orphans' Court is reversed, and the record is remitted with instructions to award distribution in accordance with the rule laid down in this opinion.

READ, J.—I concur in this judgment, understanding it not to interfere with our decision in Abbott's Appeal, 14 Wright 234.